UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 6:17-CR-70-CHB-HAI-2 |
| | ) | |
| v. | ) | RECOMMENDED DISPOSITION |
| | ) | |
| KIM MYRICK, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

In June 2018, Defendant Kim Myrick, through counsel, filed a motion for a psychiatric exam. D.E. 78. A lengthy series of proceedings and evaluations ensued, as described in further detail below. Now, Bureau of Prisons staff ("BOP") and defense expert Dr. Dustin Wygant, a psychologist, have completed forensic evaluations ("the Second Pennuto Report") ("the 2021 Wygant Report"), and both reports and the BOP's certificate of restoration of competency to stand trial have been filed in the record. D.E. 512, 513, 545-1. Having fully considered the record including the various forensic reports, testimony presented at the April 15, 2021 hearing, and the certificate of Defendant's restoration of competency, the undersigned recommends that District Judge Boom find Defendant competent to face further proceedings, to include trial, in this matter.[1]

I.

On June 8, 2018, Defendant filed his motion for a psychiatric exam. D.E. 78. On June 25, 2018, the Court conducted an in-person competency hearing in this matter, per 18 U.S.C. §§ 4241 and 4242. D.E. 92. Following a hearing, the undersigned found that there was reasonable cause

---

[1] A finding that Defendant is unable to proceed to trial due to mental incompetence could be dispositive of his case. Thus, the Court proceeds via recommended disposition, pursuant to 28 U.S.C. § 636(b)(1)(B)-(C).

to believe that Defendant may be suffering from a mental disease or defect rendering him mentally incompetent, as defined in 18 U.S.C. § 4241(a). D.E. 93. Therefore, upon the required findings, the Court ordered a psychiatric evaluation to determine Defendant's competency. *See id.*; D.E. 98.

While Defendant was out of the District, a Second Superseding Indictment charging conspiracy to distribute more than 500 grams of a methamphetamine mixture was issued in this case. D.E. 489. A motion for arraignment remains pending. D.E. 490. Because Defendant's competency has remained unresolved, he has not yet been arraigned on the new indictment.

Defendant's original evaluation occurred at FCI Englewood. All parties had access to the resulting forensic report ("the Dwyer Report") issued by forensic psychologist Jeremiah Dwyer, Ph.D. D.E. 172. After receipt and circulation of the Dwyer Report, the undersigned conducted a hearing pursuant to 18 U.S.C. §§ 4241 and 4247(d) on October 22, 2018. D.E. 202. At that hearing, defense counsel presented the testimony of Dr. Dwyer and requested a continuance of the hearing to assess how to proceed. Defense counsel was later replaced, and replacement counsel filed a motion to approve the hiring of Dr. Dustin Wygant, a psychologist, to further investigate Defendant's competency. The Court approved that request (D.E. 221), and Dr. Wygant subsequently issued his own Forensic Psychological Report ("the 2019 Wygant Report"). D.E. 264. Dr. Wygant opined that:

> Mr. Myrick has a mental defect (intellectual disability) that impacts his ability to assist properly in his own defense. He does appear to have minimal ability to understand the nature and consequences of the proceedings against him. This implies that while he may possess foundational aspects of competency, he appears to lack the rational and decisional capacity often required of defendants in a trial setting.

D.E. 264 at 13.[2] He based this opinion on several limitations he found Defendant suffers from in his ability to assist in his defense.

On April 25, 2019, the Court reconvened the competency hearing. D.E. 277. At the outset, counsel indicated that an agreement had been reached concerning Defendant's competency. D.E. 278 at 2. Counsel for the United States indicated that the 2019 Wygant Report had been provided to Dr. Dwyer and that, based upon the 2019 Wygant Report and additional information Dr. Dwyer had obtained, Dr. Dwyer now agreed with Dr. Wygant's opinion. *Id.* In order to develop the record concerning the potential to restore Defendant's competency, the Court heard the testimony of both Dr. Dwyer and Dr. Wygant. *Id.* Both agreed that treatment should be undertaken to attempt to restore competency. *Id.* Thus, the undersigned issued a recommended disposition finding that Defendant was not competent to proceed to trial and that further hospitalization pursuant to 18 U.S.C. § 4241(d) was warranted. *Id.* at 5. District Judge Boom adopted the undersigned's recommendation, and Defendant was transported to FMC Butner for further evaluation. D.E. 286.

After completing the evaluation, the BOP forwarded to the Court the resulting forensic report ("the Wadsworth Report"). D.E. 374; D.E. 377. The Wadsworth Report was authored by Forensic Psychologist Gillespie Wadsworth, Psy.D., and includes Dr. Wadsworth's opinion that Defendant was not competent to stand trial at that time, but that there was "a substantial probability with continued hospitalization and treatment [Defendant's] competency [could] be restored." D.E. 377 at 13. On December 5, 2019, the undersigned conducted a teleconference to discuss the recommendation of an additional treatment period. D.E. 378. The parties indicated no objection and the undersigned extended Defendant's hospitalization for treatment for an additional 120 days. D.E. 379.

---

[2] All pinpoint citations to docket entries are to the page numbers generated by CM/ECF.

3

Following completion of the first extension to the evaluation, the BOP forwarded to the Court the resulting Forensic Evaluation Report ("the First Pennuto Report"). D.E. 474; D.E. 475. The First Pennuto Report, authored by Forensic Neuropsychologist Tracy Pennuto, J.D., Ph.D., includes Dr. Pennuto's opinion that Defendant was incompetent to stand trial at that time, but that his competency could be restored with continued hospitalization and treatment. D.E. 475 at 11. Dr. Pennuto's opinion was based on Defendant's minimal cooperation with restoration treatment and symptoms of depression and anxiety, "which may [have been] impacting his concentration and ability to retain information." *Id.* Subsequently, the government filed a motion to further extend Defendant's restoration treatment. D.E. 477. On September 15, 2020, the undersigned conducted a teleconference to discuss the First Pennuto Report and the government's motion, during which defense counsel indicated no objection to extending Defendant's evaluation. D.E. 478. Thus, the undersigned extended Defendant's hospitalization for treatment for an additional 120 days. D.E. 479.

After completing the extended evaluation, all parties had access to the resulting Forensic Evaluation Report ("the Second Pennuto Report") and certificate of Defendant's restoration of competency to stand trial. *See* D.E. 512; D.E. 513; *see also* 18 U.S.C. § 4241(e). The Second Pennuto Report includes Dr. Pennuto's opinion that Defendant is currently competent to stand trial. D.E. 513. Dr. Pennuto bases her opinion on Defendant's "rudimentary but sufficient rational and factual understanding of the charges and proceedings against him" and concludes that Defendant "can assist in his defense if he so chooses." D.E. 513 at 11.

Next, Dr. Wygant conducted his second competency assessment of Defendant. Defense counsel filed the resulting 2021 Wygant Report under seal, in which Dr. Wygant opines that Defendant "has a mental defect (intellectual disability) that impacts his ability to assist properly in

4

his own defense" that results in a finding of incompetency. D.E. 545-1 at 13. The undersigned conducted a hearing pursuant to 18 U.S.C. §§ 4241 and 4247(d) on April 15, 2021. D.E. 547. During the hearing, defense counsel presented the testimony of Dr. Wygant, and the government presented the testimony of Dr. Pennuto. Counsel for both parties agreed that all forensic reports in the record may be utilized by the Court in reaching its decision.

II.

Section 4241 codifies the competency principles of *Dusky v. United States*, 362 U.S. 402 (1960) (per curiam). To be competent, a defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him." *Dusky*, 362 U.S. at 402; *see also* 18 U.S.C. § 4241(a) (phrasing test as whether defendant is "unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense"); *United States v. Nichols*, 56 F.3d 403, 410 (2d Cir. 1995) (applying the "two-prong" competency test from *Dusky*).

The procedural framework warrants attention. The initial determination of incompetency was made pursuant to section § 4241(d), which mandates that a defendant is not competent if, "after the hearing, the court finds by a preponderance of the evidence that the defendant" meets the incompetency definition of § 4241(a). This framework suggests that the defense bears the burden, although the cases are in disagreement on burden allocation. *Compare United States v. Chapple*, 47 F.3d 1170, at *2 (6th Cir. Jan. 6, 1995) (table) (burden on United States, though without statutory analysis) *and United States v. Salley*, 246 F. Supp. 2d 970, 976 (N.D. Ill. 2003) (burden on United States) *with United States v. Simmons*, 993 F. Supp. 168, 170 (W.D.N.Y. 1998) ("The burden to prove a lack of competence is on the defendant."). Here, the proof is disputed, and thus, the Court must resolve the burden allocation question. *See, e.g.*, *Medina v. California*,

5

505 U.S. 437, 449 (1992) (indicating that argument over burden, in competency context, only matters in "narrow class" of cases where proof is "in equipoise"). At the outset of the initial competency hearing held on October 22, 2018, the defense assumed the burden. D.E. 215 at 6.

Following the filing of a certificate of restoration of competency, section 4241(e) governs and states the "court shall hold a hearing, conducted pursuant to the provisions of section 4247(d), to determine the competency of the defendant." Section 4247(d) assures certain trial-type rights. These include rights of confrontation, cross-examination, and participation. *See* 18 U.S.C. § 4247(d); *see also* 18 U.S.C. § 4241(c) (referencing § 4247(d) for hearing procedure). Of course, those rights were afforded to the parties.

Although section 4241(e) refers to section 4241(d), which has its own description of the findings required to sustain incompetency, the statutory framework suggests a unique or revised burden allocation when assessing restoration. Section 4241(e) states:

> If, after the hearing, the court finds by a preponderance of the evidence that the defendant has recovered to such an extent that he is able to understand the nature and consequences of the proceedings against him and to assist properly in his defense, the court shall order his immediate discharge from the facility in which he is hospitalized and shall set the date for trial or other proceedings.

A natural reading suggests the government bears the burden to establish restoration. *See United States v. Carter*, No. 1:12-CR-29, 2013 WL 6668715, at *11 (E.D. Tenn. Dec. 18, 2013) ("It appears the burden of proving a defendant who was previously found incompetent is now competent may be allocated to the government" and placing the burden on the government per the parties' agreement); *United States v. Baldwin*, No. 1:10-CR-00146, 2012 WL 5205814, at *2 (W.D. Mich. Oct. 22, 2012) (same). However, even in the section 4241(e) context, "'The bar for incompetency is high[.]'" *United States v. Willis*, 362 F. App'x 531, 534 (6th Cir. 2010) (quoting *United States v. Miller,* 531 F.3d 340, 350 (6th Cir. 2008)).

6

At the outset of the April 15, 2021 hearing, the Court reminded the parties that the defense had previously accepted the burden of proving incompetency and asked defense counsel if there was any objection to that allocution. Rec. at 00:02:14 -00:02:32. Defense counsel responded, "We are ready to go forward, Your Honor. . . . I'm ready to call the first witness." Rec. at 00:02:32-00:02:35. The Court construed this as the defense continuing to assume the burden. Both parties were given the opportunity to fully examine and re-examine all witnesses, so the order of proof does not affect the Court's consideration of the evidence presented. Thus, even if the defense had not assumed the burden and it were placed upon the government pursuant to section 4241(e), the Court's evaluation of all of the evidence of record indicates Defendant has recovered to such an extent that he is competent.

### III.

The dispute is that Dr. Pennuto opines that Defendant can assist properly in his defense, whereas Dr. Wygant says he cannot. They also disagree on the extent of Defendant's intellectual disability, but that is a sub-issue in the overall analysis. Although fairly narrow when characterized in terms of whether Defendant can assist properly in his defense, the various findings in the reports frame the issue and reveal its complexities. Thus, both reports and related testimony must be analyzed in full. Important components are described below, but all of the reports have been fully considered.

The Second Pennuto Report is based upon Dr. Pennuto's personal interactions with Defendant, clinical interviews, behavioral observations, weekly group competency restoration sessions, the results of administering the Revised-Competency Assessment Instrument ("R-CAI"), and observations of the medical, correctional, and mental health staff. D.E. 513 at 1.

The Second Pennuto Report indicates that Defendant was prescribed multiple medications at the beginning of the evaluation period. *Id.* at 2-3. Throughout the evaluation period, Defendant remained "calm, alert, and oriented" and his "communications were goal-directed and relevant to the questions asked." *Id.* at 4. Based on the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5"), the Second Pennuto Report diagnoses Defendant with borderline intellectual functioning, mild persistent depressive disorder, alcohol use disorder in a controlled environment, and stimulant use disorder, cocaine, in a controlled environment. *Id.* at 7. Defendant was prescribed Wellbutrin, Buspar, Paxil, and Remeron to treat his psychiatric disorders. *Id.* at 3. Throughout the study period, Defendant communicated with BOP staff which prescriptions were effective and which he preferred to discontinue. *Id.* at 2-3. Defendant also presented BOP medical staff with requests to try new medications. *Id.*

As to the diagnosis of borderline intellectual functioning, the Second Pennuto Report indicates that Defendant's "diagnosis reflecting the severity of his intellectual deficits has fluctuated. That is, he has at times been diagnosed with borderline intellectual functioning, and at other times with mild intellectual disability." *Id.* at 8. The Second Pennuto Report indicates that "[b]orderline intellectual functioning is a level of measured intellectual performance, indicating below average functioning when compared to one's same-aged peers, but not so low as to indicate the presence of an intellectual disability." *Id.* The Report also explains that past diagnoses would have been based on Defendant's IQ scores, but currently "the DSM-5 dictates that such a diagnosis be made based on [Defendant's] adaptive functioning." *Id.* "Adaptive functioning refers to how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background." *Id.* After taking into consideration Defendant's school records, living conditions, and work history, the Second Pennuto

8

Report concludes that Defendant's "adaptive functioning appears fairly intact and independent, with the exception of assistance needed for reading." *Id.* Thus, despite Defendant's history of lower IQ scores, Dr. Pennuto opines that Defendant's "intellectual functioning is best conceptualized as borderline intellectual functioning." *Id.* 8-9.

The Second Pennuto Report also addresses Defendant's general understanding of the criminal proceedings against him and his ability to communicate with counsel. Defendant stated he is charged with "[c]onspiracy to distribute 500 grams or more of meth" and that he faces a sentence of "10 to life." *Id.* at 9. Defendant demonstrated "a basic but adequate understanding of the roles of various court personnel." *Id.* at 10. As to plea bargaining, Defendant discussed potential options for his own case, but indicated he did not recall what rights he would waive if he plead guilty, which Dr. Pennuto reviewed with him. *Id.*

As to how he can assist defense counsel, Defendant stated, "Just be quiet and let them do their job." *Id.* Defendant also stated that he could not do anything if a witness lied in court or said something that he did not understand. *Id.* However, after review with Dr. Pennuto, Defendant understood that he should instead communicate with his attorney. *Id.*

In sum, the Second Pennuto Report concludes that Defendant has "a basic but adequate understanding of many aspects of competency-related abilities." *Id.* at 11. Further, Defendant "has a good understanding of the charges against him" and has "discussed relevant case material, potential evidence, and has indicated potential defense strategies he would like to consider." *Id.* Finally, the Second Pennuto Report concludes that Defendant "is capable of cooperating fully, attending adequately, communicating relevantly, and maintaining appropriate courtroom behavior if he so chooses." *Id.* Thus, Dr. Pennuto opines that Defendant "does not currently suffer from a

9

mental disease or defect rendering him mentally incompetent that would preclude him from proceeding to trial." *Id.*

The 2021 Wygant Report is based upon Dr. Wygant's clinical interview and mental status examination of Defendant, all previous forensic reports, a competency to stand questionnaire completed by defense counsel, and results of administering the Test of Memory Malingering ("TOMM") and Repeatable Battery for the Assessment of Neuropsychological Status (RBANS). D.E. 545-1 at 2. The TOMM is a "cognitive symptom validity test that is sensitive to effort and motivation" and assists in differentiating between "feigned and genuine neurocognitive impairment." *Id.* at 6. Defendant's TOMM results indicate that he "put forth good effort and did not feign neurocognitive defects." *Id.* The RBANS assesses "various areas of neurocognitive functioning" and indicated that Defendant "will have difficulty sustaining focus, which is necessary to encode things into memory for later retrieval." *Id.* at 6-7.

The 2021 Wygant Report indicates similar diagnoses to those included in the Second Pennuto Report based on the DSM-5, but concludes that Defendant suffers from mild intellectual disability rather than borderline intellectual functioning. *Id.* at 7. The 2021 Wygant Report states that this diagnosis is based on Defendant's current IQ of 63, which falls in the extremely low range, his past IQ results ranging from 61 to 70 prior to the competency evaluations, his IQ results during his competency evaluations, which fell in the extremely low range, and his adaptive functioning. *Id.* at 11. Like Dr. Pennuto, Dr. Wygant also analyzed the conceptual, practical, and social aspects of Defendant's lifestyle, but concluded that those aspects align with a diagnosis of mild intellectual disability rather than borderline intellectual functioning. *Id.*

The 2021 Wygant Report indicates that, based on Dr. Wadsworth and Dr. Pennuto's arguments that Defendant's deficits in his neurocognitive functioning "are better explained by his

10

intellectual disability, history of brain injury, and chronic drug use," Dr. Wygant "revised his diagnostic impressions to remove the diagnosis of Neurocognitive Disorder." *Id.* However, the Report states that there is still "objective evidence that [Defendant's] neurocognitive functioning is still compromised." *Id.*

The 2021 Wygant Report describes questioning regarding trial, specific aspects of Defendant's case, his reasoning ability, and his ability to learn and retain information. *Id.* at 7. Although the 2021 Wygant Report indicates Defendant "provided limited details regarding the alleged instant offense," Defendant was able to identify that he is charged with a methamphetamine related offense. *Id.* However, Defendant was confused about the terms "conspiracy" and "superseding indictment." *Id.* Defendant could not remember the explanation his attorney had given about the concept of superseding indictments. *Id.* at 8. Defendant described the basic roles of his attorney, the prosecutor, witnesses, and the judge, but had trouble differentiating between a jury and grand jury and between a jury trial and bench trial. *Id.* However, Defendant identified the basic role of the jury as deciding guilt. *Id.* Defendant did not know why his attorney "would want to know all of the details about the allegations from him" and indicated that he would consider talking to the prosecutor without his attorney present "if he's trying to talk something decent." *Id.*

As to his plea options, the 2021 Wygant Report indicates that Defendant was able to explain the concept of plea bargaining. However, when asked how he would decide whether to accept or reject a plea deal, Defendant stated, "I don't know. I always just plead guilty. I hope my lawyer would tell me what to do." *Id*. at 9. Although Dr. Wygant attempted to discuss this topic further, Defendant "became distracted and persisted in discussing his concerns that his daughter was trying to sell his house." *Id.* The 2021 Wygant Report also indicates that Defendant understands

11

appropriate courtroom behavior and that "he can communicate with his attorney during the trial process." *Id.*

As to the Attorney Competency to Stand Trial Questionnaire, a form completed by defense counsel covering "various concerns about competency, as well as expected aspects of the defendant's case[,]" the 2021 Wygant Report reflects defense counsel's concerns regarding Defendant's memory and intellectual functioning. *Id.* Specifically, defense counsel expressed concerns regarding Defendant's ability to make a decision regarding a plea agreement and to testify accurately about important facts. *Id.* at 9-10. Additionally, defense counsel directly communicated concerns to Dr. Wygant regarding Defendant's understanding of legal concepts, "unusual lack of concern about his case," limited intelligence, ability to be easily misled, and overall being of "very limited assistance in reviewing the discovery and preparing his defense." *Id.* at 10. In sum, the 2021 Wygant Report concludes:

> [Defendant] has a mental defect (intellectual disability) that impacts his ability to assist properly in his own defense. While he does appear to minimally understand *some* information pertaining to the nature and consequences of the proceedings against him, he appears to lack the rational and decisional capacity often required of defendants in a trial setting. Therefore, this examiner opines that [Defendant] *does not* appear to be competent to proceed to trial.

*Id.* at 13.

## IV.

Both experts testified consistently with their forensic reports.

During his direct testimony, Dr. Wygant confirmed the information contained in his 2019 and 2021 Reports. Regarding the RBANS tests, Dr. Wygant noted that the results included in his 2019 and 2021 Reports are similar and indicate that Defendant's neurocognitive deficits are still present. Rec. at 00:38:37-00:39-10.[3] As to the removal of the neurocognitive disorder diagnosis,

---

[3] Time stamps refer to the time elapsed from the beginning of the recording.

Dr. Wygant explained that he found the opinion of the BOP evaluators that any apparent neurocognitive deficits may be better accounted for by Defendant's overall lower cognitive functioning to be reasonable. Rec. at 00:39:30-00:40:38. However, Dr. Wygant clarified he still opines that Defendant has a mild intellectual disability. Rec. at 00:40:22-00:40:28. Further, Dr. Wygant noted that both the Wadsworth Report and First Pennuto Report also diagnose Defendant with mild intellectual disability. Rec. at 00:43:09-00:43:45.

Regarding Defendant's competency, Dr. Wygant explained that his assessment method is very similar to the R-CAI utilized by the BOP. Rec. at 00:52:03-00:53:46. In light of the 2021 assessment results, Dr. Wygant further stated that his concerns have increased since his 2019 Report due to Defendant's neurocognitive deficits that would impair him during trial and his lack of ability to make a decision regarding a plea bargain. Rec. at 00:50:23-00:51:34.

During cross examination, Dr. Wygant admitted that a mild intellectual disability alone does not mean an individual is incompetent. Rec. at 01:00:22-01:00:27. Dr. Wygant also stated that he spent a combined total of eight and a half hours evaluating Defendant. Rec. at 01:05:35-01:06:07. The Court also briefly questioned Dr Wygant, during which he explained that he equally weighed the aspects of criminal procedure that Defendant does and does not understand in reaching in conclusions. Rec. at 01:06:27-01:08:24. Finally, Dr. Wygant opined that there are no means to adequately educate and restore Defendant's competency in light of the results from the current restoration evaluation. Rec. at 01:08:25-01:10:08.

During her direct testimony, Dr. Pennuto confirmed the information contained in her 2019 and 2020 Reports. Regarding psychiatric treatment, Dr. Pennuto explained that Defendant was struggling with depression and anxiety, which can impact functions necessary for competency. Rec. at 01:29:38-01:31:08. Thus, treatment of those disorders was important for competency

13

restoration, and the successful regulation of their symptoms factored into Dr. Pennuto's finding of competency. Rec. at 01:31:09-01:31:27.

As to Defendant's intellectual functioning, Dr. Pennuto stated that it is impossible for someone to perform better than their abilities, but it is quite possible to underperform, which can explain the differences among Defendant's test results. Rec. at 01:32:49-01:33:19. Dr. Pennuto stated that, while there was never any indication that Defendant was malingering, there were many occasions when he was not fully engaged in the program and refused to attend group and individual treatment sessions. Rec. at 01:33:22-01:34:05. Dr. Pennuto also stated that Defendant's intellectual functioning "falls right at the cusp" of borderline intellectual functioning and mild intellectual disability. Rec. at 01:35:06-01:35:25. During his treatment, Defendant advocated for himself concerning his medications and effectively communicated other needs. Rec. at 01:36:06-01:37:05. Dr. Pennuto also highlighted Defendant's ability to regulate his behavior, hold a job, raise a family, and maintain adequate hygiene as parts of his adaptive functioning that weighed in favor of a borderline intellectual functioning diagnosis. Rec. at 01:37:11-01:38:50. In any event, Dr. Pennuto stated that, even if her diagnosis of mild intellectual disability remained unchanged, this would not preclude Defendant's competency restoration and would not change her ultimate opinion that he is currently competent to stand trial. Rec. at 01:45:20-01:46:11.

Dr. Pennuto stated that Defendant "absolutely" demonstrated knowledge of the charged offense and was able to explain why he disagreed that his alleged behavior would be consistent with such a charge. Rec. at 01:41:07-01:42:10. However, his specific statements were left out of the Second Pennuto Report due to the Report's distribution to all parties. Rec. at 01:41:26-01:41:39. Dr. Pennuto also explained that information was not initially easy to obtain from Defendant. Rec. at 01:42:10-01:42:56. However, after building a rapport, Dr. Pennuto was able

14

to push Defendant to respond to questions that he originally said he did not know the answer to. Rec. at 01:42:56-01:43:16.

During cross examination, Dr. Pennuto explained that her First Report adopted the findings and diagnoses of Dr. Wadsworth because, at the time, she had yet to have the opportunity to evaluate Defendant and he had only completed a portion of the restoration program due to COVID-19 restrictions. Rec. at 02:02:22-02:04:21. However, once Dr. Pennuto was able to fully engage with Defendant, her findings differed from those in the First Pennuto Report and Wadsworth Report. Rec. at 02:06:35-02:08:05. Regarding adaptive functioning, Dr. Pennuto stated that Defendant's abilities prior to and during his time in custody were taken into account, and both support her diagnosis of borderline intellectual functioning. Rec. at 02:08:29-02:19:21.

During her redirect, Dr. Pennuto explained that intellectual functioning is not synonymous with competency, but that it correlates with a person's ability to learn. Rec. at 02:23:20-02:24:25. Dr. Pennuto further explained that an individual could have a high level of intellectual functioning and be incompetent and vice versa. Rec. at 02:24:27-02:25:03. Thus, Defendant's lower level of intellectual functioning does not preclude his competency. Rec. at 02:24:37-02:25:10. The Court briefly questioned Dr. Pennuto, during which she explained that the goal of competency restoration is to assess whether an individual can learn, understand, and apply concepts related to the criminal trial process and not whether an individual has a perfect understanding of those concepts. Rec. at 02:31:54-02:33:28.

The Court heard argument from the parties. Defense counsel stated that the main competency concern is Defendant's present ability to consult with and assist his lawyer. Rec. at 02:39:00-02:39:19; 02:51:30-02:52:10. Defense counsel argued that no significant changes occurred between the First and Second Pennuto Reports other than Defendant attending group

15

sessions. Rec. at 02:40:00-02:41:26. Defense counsel further argued that the R-CAI results contained in the Second Pennuto Report support a finding of incompetency. Rec. at 02:42:09-02:43:00. Defense counsel concluded that, while most defendants require initial help to understand concepts of the criminal process, competency becomes an issue when they cannot retain the information. Rec. at 02:46:57-02:47:31. In this case, defense counsel argued that it is unlikely he will be able to accomplish more with Defendant than the other professionals involved in the restoration program had. Rec. at 02:45:06-02:46:53.

The government argued that the Reports prior to the Second Pennuto Report are not dispositive of Defendant's present competency. Rec. at 02:49:16-02:49:34. Rather the prior Reports indicate Defendant's need for further restoration treatment at those times and the Second Pennuto Report reflects the achievement of competency restoration. Rec. at 02:49:25-02:50:50.

V.

The record establishes that Defendant is competent under *Dusky* and the statutory framework. Given the previous finding of incompetency, the question is whether Defendant has recovered to such an extent that he is able to understand the nature and consequences of the proceedings against him and to assist properly in his defense. 18 U.S.C. § 4241(e). There is no dispute that Defendant has a basic understanding of the proceedings.

The first dispute is the extent of his intellectual disability. The evidence supports a conclusion that Defendant is suffering from borderline intellectual functioning. Even if Defendant suffers from the more severe form of mild intellectual disability, on its own this would not preclude a finding of competency. Dr. Pennuto testified that, even if she diagnosed Defendant with mild intellectual disability, her ultimate opinion that Defendant is currently competent to stand trial would not change. Further, Dr. Wygant agreed that a diagnosis of mild intellectual disability

would not necessitate, on its own, a finding of incompetency. The impairment, which is permanent, has to be assessed in terms of its impact upon his ability to assist in his defense.

The parties agree that the issue of competency is limited to whether, in light of his disability, Defendant can properly assist in his defense. Dr. Wygant has twice opined that Defendant "appears to lack the rational and decisional capacity often required of defendants in a trial setting." D.E. 264 at 13; D.E. 545-1 at 13. He explained at the hearing that his concern relates to appreciating the nature of the charges, the strength of the case, and weighing the risks, costs, and benefits within plea negotiations or in a trial setting. He thinks that someone with Defendant's disability, memory deficits, and attention deficits would struggle with such high-level decision-making processes either in plea negotiations or a trial setting. The *Dusky* standard focuses upon Defendant's present ability to consult with his lawyer, but there are some predictive aspects of the analysis as well in light of anticipated decisions prior to, and during, trial. The very lengthy record established by five forensic reports paints a vivid portrait of Defendant's mental health. All evaluations and related testimony strike the Court as credible. BOP staff initially assessed Defendant as competent, but revised that assessment based on Dr. Wygant's 2019 findings and testimony. Similarly, Dr. Wygant withdrew a previous diagnosis of neurocognitive disorder after considering the "arguments" of Dr. Wadsworth and Dr. Pennuto. Thus, the evaluators are providing candid assessments, and there is no evidence of bias or prejudice in any way.

The challenge is to assess Defendant's ability to effectively function in defending the case from what is known about Defendant's past behavior and present diagnoses. Typically insight from defense counsel is very persuasive, and here that insight has been provided through Dr. Wygant's utilization of the Attorney Competency To Stand Trial Questionnaire. Dr. Wygant's concerns focused on Defendant's ability to understand specific concepts, such as "conspiracy" and

17

"superseding indictment," and to decide whether to accept a plea bargain or proceed to trial. However, Dr. Pennuto testified that Defendant was able to discuss the alleged offense and underlying conduct. Further, Defendant was able to articulate to Dr. Pennuto why he disagreed that his alleged behavior would meet the elements of such a charge. The substance of his objections was not contained in her report, but there is no reason to believe Defendant did not actually discuss these components of a potential defense with her. Defendant "discussed relevant case material, potential evidence, and [] indicated potential defense strategies he would like to consider." D.E. 513 at 11. Importantly, Dr. Pennuto indicated that Defendant's personality required her to build rapport with him in order to elicit such substantive answers. Dr. Pennuto explained that Defendant would often say he did not know the answers to her questions, but would eventually give correct responses after some persistence. Indeed, the 2021 Wygant Report indicates that Defendant would not elaborate on his answers regarding plea bargaining and preferred to discuss concerns unrelated to the competency evaluation. D.E. 545-1 at 9. The limited amount of time Dr. Wygant spent with Defendant, a total of eight and a half hours over the course of the two evaluations, compared to the several months Defendant spent with Dr. Pennuto and other BOP staff, may very well explain this discrepancy. Dr. Pennuto's description of Defendant's understanding of the charge, his disagreement with it, and discussion of strategic aspects of the case is strong evidence that he can properly assist in defending the case going forward and tips the scales beyond a preponderance in favor of competency.

Defense counsel's assertion that the only significant change between Defendant's evaluations is an increase in group sessions, totaling 8, is unsupported by the record. First, his recent performance on the R-CAI indicates significant comprehension of case-related concepts. D.E. 513 at 9-11. The indications that he may be somewhat passive when confronted with a lying

18

witness or need to help his attorney strike the Court as not necessarily indicative of an inability to participate and assist in the defense, particularly given his stated desire to be found not guilty and discussion of disagreement with the charge. Second, Dr. Pennuto's Reports and her testimony indicate that Defendant's symptoms related to his anxiety and depression affected his competency. Since the First Pennuto Report, sufficient time has passed to allow Defendant's medications to regulate and take effect. In fact, Dr. Pennuto testified that the effectiveness of the medications was apparent in Defendant's demeanor, ability to answer questions, and engage with her. Moreover, the Second Pennuto Report reflects that Defendant assumed an active role in managing his medications by communicating effectively with BOP staff when he wanted to discontinue a prescription, increase a dosage, or try different medications. D.E. 513 at 2-3. Between the Second Pennuto Report and 2021 Wygant Report, Defendant retained that he should communicate if a witness lies and that he would give up his right to a trial if he pleads guilty. D.E. 545-1 at 9. These are significant improvements that indicate Defendant can retain new information and communicate effectively when he chooses to be engaged.

Based on all of the available information, Dr. Pennuto concluded that Defendant "does not currently suffer from a mental disease or defect that would preclude him from proceeding at trial." (D.E. 513 at 11), and the undersigned agrees. Dr. Pennuto's Reports and testimony reflect a long-term evaluation of Defendant with accepted testing and observation methods. The evidence supports a finding that Defendant possesses "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as a factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960).

VI.

For the foregoing reasons, the Court finds that, per 18 U.S.C. § 4241(e) and based on the evidence presented, the Defendant is able to understand the nature and consequences of the proceedings against him and to assist properly in his own defense. Therefore, the Court **RECOMMENDS** that the District Judge find that Defendant is competent to face further proceedings, to include trial, in this matter.

The Court issues this Recommended Disposition pursuant to 28 U.S.C. § 636(b)(1)(B). The parties should consult that statute and Federal Rule of Criminal Procedure 59(b) concerning the right to appeal to the District Judge. Any objection must be filed within **FOURTEEN DAYS** of the entry of this order. Failure to object per Rule 59(b) waives a party's right to review. Upon expiration of the objections period, this matter will be referred to Judge Boom for her consideration, with arraignment on the Second Superseding Indictment to occur as permissible thereafter.

This the 13th day of May, 2021.

Signed By:
Hanly A. Ingram
United States Magistrate Judge